# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2020

Lyle W. Cayce
Clerk

No. 18-40884

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

MOHAMED EBRAHIM SALIM MOTON, also known as Mohamed Moton Salim, also known as Salim Moton,

      Defendant - Appellant

---

Appeal from the United States District Court
For the Southern District of Texas

---

Before HIGGINBOTHAM, JONES, and DUNCAN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Convicted of two counts of possession with intent to distribute a synthetic cannabinoid and sentenced to concurrent terms of 186 months in prison followed by 36 months of supervised release, Mohamed Ebrahim Salim Moton contests the sufficiency of the evidence to prove he had the requisite mens rea, the drug quantity used to calculate his base offense level, and a sentencing enhancement for maintaining drug premises. We affirm.

No. 18-40884

## I.

Moton, a native and citizen of India, came to the United States as a tourist in October 2014, but within two years, he was packaging a synthetic cannabinoid for two men he met at his mosque. In 2016, the Houston Police Department received a tip regarding narcotics activity at a storage facility. Observing a man unloading boxes from a blue minivan into a storage unit flagged by the facility's manager, police followed and stopped him for a traffic violation. Moton was the driver. Identity in hand, police began surveilling Moton. They watched him load boxes from the storage unit into his minivan and drive to a gas station a few miles away, where he deposited a box and two black trash bags into a dumpster. After Moton drove off, police recovered the box and trash bags, which contained materials often used to produce synthetic cannabinoids: baggies, loose leaves, receipts for acetone, a box for a digital scale, a package for a respirator, bottles of Tasty Puff flavoring, and labels advertising the flavor and potency of the synthetic cannabinoid. The bag's contents tested positive for synthetic cannabinoid.

The police continued to surveil Moton as he regularly visited other storage facilities and a house on Mulholland Drive in southwest Houston (the "House"). Moton was the only person who police saw visiting the House. Moton regularly dropped off trash bags at storage units for pick up by Moton's co-defendant, Ataru Rahman Malik. Officers saw Moton put black trash bags in the trunk of Malik's unattended car and immediately leave. They observed Malik return to his car and transfer the bags to a vehicle driven by another of Moton's co-defendants. Officers conducted a traffic stop of the vehicle, confiscating 800 baggies of synthetic cannabinoids.

Officers arrested Moton at the House. With unfurnished rooms and empty kitchen cabinets, the House was no home. It was a large-scale manufacturing lab: chemical flavoring was stored in a bedroom, containers of

2

No. 18-40884

acetone were in the garage, and tubs filled with packaged synthetic cannabinoids were in the backroom. Fans blew chemical odors out of the chimney, and a machine was used to seal the packaged drugs. The officers also found approximately 580 pounds of synthetic cannabinoids, as well as Moton's utility bill for the House.

With the help of an Urdu-speaking interpreter, police advised Moton of his rights and interviewed him. Moton then described the process for delivering synthetic cannabinoids to storage units, explaining that he was paid by cash left for him in the units. On searching the units, including one listed in Moton's name, police found materials used to produce synthetic cannabinoids.

Moton testified at trial that he mixed artificial flavoring with dry green leaves, estimating that he had packaged between 75,000 and 200,000 bags. While each contained 10 grams of the dried leaves, he denied knowing that the leaves contained synthetic cannabinoids or that any aspect of the business was illegal, saying that his difficulty with English left him unaware that the business was illegal.

At the close of evidence, Moton unsuccessfully moved for a judgment of acquittal. The jury found him guilty of two counts of possession with intent to distribute synthetic cannabinoids and not guilty on the remaining conspiracy charge.

## II.

In calculating Moton's base offense level under the Sentencing Guidelines, the presentence report ("PSR") attributed to him (1) $107,940.00 in drug proceeds discovered in Malik's safety deposit box and (2) 434,319.50 grams of cannabinoids seized at different locations. The drug proceeds and seized cannabinoid totaled to 2,593,119.50 grams of synthetic cannabinoid. Using an unstated multiplier, the PSR converted this figure to 409,274

No. 18-40884

kilograms of marijuana, which has a base offense level of 38.[1] The PSR then added a two-level enhancement under § 2D1.1(b)(12) of the Guidelines for maintaining premises for the purpose of manufacturing or distributing a controlled substance analogue. With a total offense level of 40 and a criminal history category of I, the advisory Guidelines range of imprisonment was 292 to 365 months, capped by statute at 240 months.[2] Varying downward, the district court sentenced Moton to concurrent terms of 186 months of imprisonment and concurrent three-year terms of supervised release. Moton timely appealed.

## III.

Moton raises three issues on appeal. He argues that there was insufficient evidence of the requisite mens rea, that the district court miscalculated his base offense level under the Sentencing Guidelines, and that the court erred in applying the sentencing enhancement for maintaining a drug premises.

## A.

Moton argues that the Government failed to prove that he had the requisite mens rea. Moton preserved his challenge, and we review the sufficiency of the evidence *de novo*, "view[ing] all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict."[3] We are to uphold the jury's verdict if "*any* rational trier of fact could have found the

---

[1] U.S.S.G. § 2D1.1(c)(1).

[2] *See* 21 U.S.C. § 841(b)(1)(C).

[3] *United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012) (internal brackets, quotation marks, and citation omitted).

No. 18-40884

essential elements of the crime beyond a reasonable doubt."[4] "The weight and credibility of the evidence are the sole province of the jury."[5]

The Controlled Substances Act ("CSA") makes it unlawful to knowingly manufacture, distribute, or possess with the intent to distribute controlled substances.[6] "The Controlled Substance Analogue Enforcement Act of 1986 (Analogue Act) identifies a category of substances substantially similar to those listed on the federal controlled substance schedules and then instructs courts to treat those analogues, if intended for human consumption, as controlled substances listed on schedule I for purposes of federal law."[7]

The Government must establish that the defendant "knew he was dealing with a controlled substance."[8] When the substance is an analogue, "that knowledge requirement is met if the defendant knew that the substance was controlled under the CSA or the Analogue Act, even if he did not know its identity."[9] A defendant's knowledge can be established in one of two ways:

> First, it can be established by evidence that a defendant knew that the substance with which he was dealing is some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance. Second, it can be established by evidence that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue.[10]

---

[4] *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[5] *United States v. Parker*, 505 F.3d 323, 331 (5th Cir. 2007).

[6] *McFadden v. United States*, 135 S. Ct. 2298, 2302 (2015) (citing 21 U.S.C. § 841(a)(1)).

[7] *Id.* (internal citation omitted). To be "substantially similar" to a controlled substance, the substances must be "substantially similar" in their chemical structure and in their actual, intended, or represented effect on the central nervous system. 21 U.S.C. § 802(32)(A).

[8] *McFadden*, 135 S. Ct. at 2302 (internal quotation omitted).

[9] *Id.*

[10] *Id.* at 2305.

5

No. 18-40884

Under the first method, the Government must prove that the defendant knew the drug was some controlled substance. To prove the defendant's knowledge, the Government need not introduce direct evidence; circumstantial evidence may suffice.[11] It is for the jury "to determine whether the circumstantial evidence proves that the defendant knew that the substance was a controlled substance under the CSA or Analogue Act."[12] Circumstantial evidence establishing knowledge might include "a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure at customs."[13] The jury was so instructed, without objection from Moton.

The jury had more than enough circumstantial evidence to convict Moton.[14] He worked in a house that police described as "[a] full-blown manufacturing lab for synthetic cannabinoids." He admitted to police that he had operated out of another house, but relocated after a neighbor asked about Moton's suspicious activities. He left trash bags filled with synthetic drugs in storage units and, on at least one occasion, in the trunk of an unattended vehicle. And to dispose of evidence, he drove three to five miles from a storage facility to a gas station instead of using the storage facility's own dumpster. We hold that there was sufficient evidence to sustain the jury's finding that Moton acted with the requisite mens rea.

---

[11] *Id.* at 2304 n.1.
[12] *Id.* at 2306 n.3.
[13] *Id.* at 2304 n.1.
[14] The jury instructions closely tracked the language in *McFadden* and are not contested on appeal.

6

No. 18-40884

## B.

When, as here, a defendant has preserved a sentencing error, we review the district court's factual findings for clear error and its application of the Sentencing Guidelines *de novo*.[15] Even if an error is established, it must be disregarded "if it is harmless, i.e., if it does not affect substantial rights."[16] On clear error review, the Government has the burden to prove the error is harmless.[17]

Under the Sentencing Guidelines, a defendant's base offense level reflects the offense of conviction and other "relevant conduct."[18] "Relevant conduct" includes a defendant's "acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."[19] Although only criminal conduct is relevant, the conduct need not have resulted in a conviction.[20] For a drug offense, the base offense level reflects the amount of drugs involved, with quantities of drugs from multiple transactions added together.[21] "Where there is no drug seizure or the amount seized does not reflect the scale of the offense," the district court "shall approximate the quantity of the controlled substance."[22]

Relevant conduct—here, the quantity of drugs—must be proven by "a preponderance of the relevant and sufficiently reliable evidence."[23] The district court may consider any relevant information, without regard to admissibility

---

[15] *United States v. Ochoa-Gomez*, 777 F.3d 278, 281 (5th Cir. 2015). Both parties assumed that Moton preserved his objection.

[16] *United States v. Randall*, 924 F.3d 790, 795 (5th Cir. 2019) (citing FED. R. CRIM. P. 52(a)).

[17] *Id.* (citing *United States v. Olano*, 507 U.S. 725, 734–35 (1993)).

[18] U.S.S.G. § 1B1.1 cmt. n.1(I).

[19] *Id.* § 1B1.3(a)(2).

[20] *See United States v. Anderson*, 174 F.3d 515, 526 (5th Cir.1999).

[21] U.S.S.G. § 2D1.1 cmt. n.7.

[22] *Id.* § 2D1.1 cmt. n.5.

[23] *United States v. Dinh*, 920 F.3d 307, 310 (5th Cir. 2019) (internal quotation omitted).

under the rules of evidence, provided the information has "sufficient indicia of reliability to support its probable accuracy."[24] A PSR generally has sufficient indicia of reliability.[25] A defendant's "[m]ere objections" do not cast doubt on the PSR.[26] The defendant must demonstrate its inaccuracy by introducing rebuttal evidence.[27]

Moton challenges his sentence on three grounds. First, he argues that the district court treated Malik's drug proceeds as relevant conduct in violation of the Guidelines. Second, he contends that the preponderance of the evidence does not support the PSR's conclusion that 434,319.50 grams of synthetic cannabinoid were seized during the investigation. Finally, he maintains that the PSR's failure to explain the multiplier used to convert synthetic cannabinoid to marijuana was a clear error. The Government does not directly confront these arguments. It rather argues that the sentencing errors were harmless because Moton admitted to packaging between 750,000 and 2,000,000 grams of synthetic cannabinoid, which exceeds the minimum weight for a base offense level of 38. We agree. Accepting as errors those identified by Moton, we conclude that they are harmless. The PSR found that Moton admitted to packing 2,000,000 grams of synthetic cannabinoid. The district court has broad discretion to credit that admission[28] and use it to calculate the base offense level.[29]

---

[24] U.S.S.G. § 6A1.3, p.s.; *United States v. Zuniga,* 720 F.3d 587, 590–91 (5th Cir. 2013).

[25] *See, e.g.*, *United States v. Barfield*, 941 F.3d 757 (5th Cir. 2019) (holding that district court can rely on defendant's uncorroborated admission that he trafficked in prior months); *United States v. Fuentes*, 775 F.3d 213, 220 (5th Cir. 2014) (affirming reliance upon facts in PSR that were based upon police reports summarizing, inter alia, victim interviews).

[26] *United States v. Alaniz*, 726 F.3d 586, 619 (5th Cir. 2013) (internal quotation omitted).

[27] *Id.*

[28] *See, e.g.*, *Barfield*, 941 F.3d at 765–66.

[29] U.S.S.G. § 2D1.1 cmt. n.5 (2016) ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.").

To determine the appropriate conversion rate for FUB-AMB, we use the marijuana equivalency of the most closely related controlled substance.[30] Based on the undisputed expert testimony presented at trial, we conclude that FUB-AMB is most closely related to THC, which has a conversion rate of 167 grams of marijuana per one gram of THC, the same conversion rate used by the parties. Applying the proper conversion rate—167 grams of marijuana per one gram of FUB-AMB—to the 2,000,000 grams of synthetic cannabinoid packed by Moton yields 334,000 kilograms of marijuana.[31] This amount is well in excess of the 90,000 kilograms of marijuana needed for a base offense level of 38. Thus, the errors in the PSR do not affect Moton's sentence and are harmless.

## C.

Moton argues that the district court erred in applying the § 2D1.1(b)(12) sentencing enhancement for maintaining a premises for manufacturing or distributing a controlled substance. "A district court's application of § 2D1.1(b)(12) is a factual finding reviewed for clear error."[32] The Guideline provides for a two-level enhancement if the defendant "knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution."[33] To determine whether the defendant "maintained" the premises, courts consider "(A) whether the

---

[30] U.S.S.G. § 2D1.1 cmt. n.6 (directing courts to consider whether the controlled substance not referenced in the guideline has a similar chemical structure, effect on the central nervous system, and potency as a controlled substance referenced in the guideline).

[31] The PSR appeared to use a conversion rate of 157.8 grams of marijuana per one gram of the synthetic cannabinoid. Even under this more generous conversion rate, 2,000,000 grams of synthetic cannabinoids is equivalent to 315,600 kilograms of marijuana.

[32] *United States v. Guzman-Reyes*, 853 F.3d 260, 263 (5th Cir. 2017) (internal quotation omitted)

[33] U.S.S.G. § 2D1.1 cmt. n.17.

defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises."[34]

Moton concedes his name was on the utility bill, and he had access to the House, "which [was] obviously being maintained for the purpose of manufacturing and distributing drugs." And Moton was the only person regularly seen at the House and was often alone there. "This level of access, dominion, and control 'suffice[s] to support a maintenance finding' under the deferential clear error standard."[35] We find no error in the application of the § 2D1.1(b)(12) enhancement.[36]

## IV.

We AFFIRM the district court's judgment.

---

[34] *Id.*

[35] *Guzman-Reyes*, 853 F.3d at 265 (quoting *United States v. Morgan,* 117 F.3d 849, 856 (5th Cir. 1997)).

[36] *See Ochoa-Gomez*, 777 F.3d at 282.