# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 25, 2021

Lyle W. Cayce
Clerk

No. 20-10008

United States of America,

*Plaintiff—Appellee*,

*versus*

Rafael Bravo,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:19-CR-83

Before Elrod, Willett, and Engelhardt, *Circuit Judges*.

Per Curiam:*

During their search of the residence of Rigo Sandoval, a known drug dealer, officers saw Rafael Bravo throwing a gun over the fence in Sandoval's backyard. The officers also discovered a stash of 2,978 grams of methamphetamine inside Sandoval's home. Bravo was charged with, and pleaded guilty to, one count of possession of a firearm by a convicted felon.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-10008

In the pre-sentence report, the probation officer concluded that Bravo was accountable for the 2,978 grams of methamphetamine inside Sandoval's home and calculated Bravo's Sentencing Guidelines range under the drug offense section based on that quantity of drugs. The district court adopted the pre-sentence report and sentenced Bravo to 120 months' imprisonment and 3 years' supervised release. Bravo argues that the district court erred in finding that the 2,978 grams of methamphetamine were within the scope of a jointly undertaken criminal activity between Bravo and Sandoval. We agree, and we vacate and remand to the district court for resentencing.

I

In December 2018, law enforcement received information that Rigo Sandoval was selling methamphetamine from his home. On January 31, 2019, officers executed a search of Sandoval's home where they encountered eight individuals, including Sandoval and his cousin, Rafael Bravo. When officers entered Sandoval's backyard, Bravo threw a gun over Sandoval's fence into an adjacent backyard. Inside the residence, officers found several firearms, ammunition, $9,236 cash, a digital scale, and 2,978 grams of methamphetamine.

Officers arrested Sandoval and Bravo. During a post-arrest interview, Sandoval admitted that he lived at the residence, the 2,978 grams of methamphetamine belonged to him, and he was involved in methamphetamine distribution. Sandoval also admitted that, in the months before his arrest, he had sold 56.7 grams of methamphetamine to Bravo, who redistributed those drugs to his own customers.

Bravo was charged with, and later pleaded guilty to, one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

No. 20-10008

When determining Bravo's Guidelines range for the pre-sentence report, the probation officer concluded that Bravo and Sandoval were co-conspirators with respect to the stash of drugs inside Sandoval's home because: (1) Bravo is Sandoval's cousin; (2) Sandoval said that Bravo had previously purchased, and then redistributed, 56.7 grams of methamphetamine from him; (3) Bravo knew that Sandoval sold drugs from his residence; and (4) Bravo was at Sandoval's home on the day of the raid. Based on this information, the probation officer held Bravo accountable for the 2,978 grams discovered inside Sandoval's home, plus the 56.7 grams that Bravo had previously purchased from Sandoval, for a total of 3,034.7 grams. After applying § 2K2.1(c)(1)(A), a cross reference from the Guidelines' firearms offense section to its drug offense section, the probation officer used the 3,043.7 grams of methamphetamine to calculate Bravo's base offense level. With a total offense level of 36 and criminal history category of IV, the Guidelines range was 262 to 327 months. Because the statutes under which Bravo was charged set a maximum sentence of 120 months, the probation officer recommended a sentence of 120 months and 1 to 3 years of supervised release. *See* 18 U.S.C. §§ 922(g)(1) & 924(a)(2); U.S.S.G. § 5G1.1(a).

Bravo filed written objections to the PSR. He objected to the PSR's description of Sandoval's admissions "to the extent this information is used as a basis for the 'drug cross reference' guideline calculations." He also objected to the use of the listed drug quantities for Guidelines calculation purposes, denying that he was a methamphetamine customer of Sandoval and that he had distributed methamphetamine to his own customer base. Finally, Bravo argued that his Guidelines range should have been calculated under the Guidelines' firearms offense section, § 2K2.1. Under that section, without the cross reference to the Guidelines' drug offense section, Bravo's base offense level would have been calculated as 20, his total offense level as

18, and his Guidelines range as 41 to 51 months. *See* U.S.S.G. § 2K2.1(a)(4)(A).

The Government argued that Bravo's objections should be overruled because Bravo offered no evidence to rebut the PSR. The Government found that Bravo and Sandoval were co-conspirators with respect to the 2,978 grams of drugs found inside Sandoval's home because: Sandoval's cell phone messages showed that Sandoval was a methamphetamine dealer; Bravo knew that Sandoval distributed drugs from his home; Bravo was arrested at Sandoval's home "where a substantial amount of methamphetamine and firearms were recovered"; Bravo and Sandoval are cousins; and Bravo had two prior convictions for drug-possession offenses. In an addendum to the PSR, the probation officer also responded to Bravo's objections and declined to make any changes.

At sentencing, Bravo relied on his written objections. The district court overruled Bravo's objections for the reasons stated by the Government and then adopted the facts and conclusions stated in the PSR. The court sentenced Bravo to 120 months' imprisonment and 3 years' supervised release. Bravo timely appealed.

Bravo argues that the district court erred by applying the § 2K2.1(c)(1)(A) cross reference because the PSR did not support the court's finding that Bravo and Sandoval had agreed to jointly undertake a criminal activity with respect to the 2,978 grams of methamphetamine found inside Sandoval's home.

## II

The parties disagree about our standard of review: Bravo argues that we should review the district court's finding for clear error, while the Government argues that we should review for plain error because Bravo did not specifically object on this basis below. To determine the appropriate

standard of review, we must first assess whether Bravo properly preserved the issue he raises on appeal. If he did, we review the district court's finding for clear error. *United States v. Chavez-Hernandez*, 671 F.3d 494, 497 (5th Cir. 2012) (citation omitted). But if he did not, we review only for plain error. *Id.*; Fed. R. Crim. P. 52(b).

To preserve an issue for appeal, a defendant must make an objection that is "sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction." *United States v. Nesmith*, 866 F.3d 677, 679 (5th Cir. 2017) (internal quotation marks and citation omitted). Where a defendant provides a written objection, we similarly consider whether the "written objection was clear enough to provide the district court with opportunity to rule on it." *United States v. Gomez-Alvarez*, 781 F.3d 787, 791 (5th Cir. 2015) (internal quotation marks and citation omitted). But we do not require that a defendant's objection below and his argument on appeal be identical. *Nesmith*, 866 F.3d at 679. Instead, a defendant preserves an issue for appeal so long as the "crux of his objection is the same" as his argument on appeal. *Id.*

Bravo's written objections before the district court have the same fundamental core as the issue on appeal—both concern whether Bravo can be held accountable for the drugs at Sandoval's home based on his purported joint criminal activity with Sandoval. Bravo objected to Sandoval's admissions and conduct, as described in the PSR, "to the extent this information [wa]s used as a basis for the 'drug cross reference' guideline calculations, or in any manner in which [Bravo] [wa]s believed responsible or accountable for the material seized." Bravo also objected to the use of the listed drug quantities for Guidelines calculation purposes, denying that he was a methamphetamine customer of Sandoval and that he distributed methamphetamine to his own customer base. Bravo's objections thus put the district court on notice that he objected to being held accountable for the

No. 20-10008

2,978 grams of methamphetamine found inside Sandoval's home. And the district court had the opportunity to address the core of Bravo's argument since it explicitly adopted the Government's response to Bravo's objections and the PSR's addendum, both of which concluded that there was a conspiracy between Bravo and Sandoval based on the facts in the PSR.

Because Bravo preserved the issue he now raises on appeal, we review the district court's application of the Guidelines de novo and its factual findings for clear error. *Gomez-Alvarez*, 781 F.3d at 791. Under the deferential clear error standard, we will uphold the district court's factual findings "if they are plausible in light of the record as a whole." *United States v. Torres-Magana*, 938 F.3d 213, 216 (5th Cir. 2019) (internal quotation marks and citation omitted). But if our "review of all the evidence leaves [us] with the definite and firm conviction that a mistake has been committed," then we must vacate and remand. *Id.*

## III

We first detail the mechanics of the Guidelines sections at issue. We then review the district court's implicit finding that Bravo and Sandoval had an agreement with respect to the stash of drugs found inside Sandoval's home.

## A

Because Bravo was charged with a firearms offense, the relevant Guideline is U.S.S.G. § 2K2.1. That section includes a cross reference, § 2K2.1(c)(1)(A), which may apply if the firearm was cited in the offense of conviction and the firearm facilitated "another offense." When "another offense" is a drug offense, the cross reference may apply if the firearm is "found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." *Id.* § 2K2.1 cmt. 14(B)(ii). The cross reference may apply

No. 20-10008

even if the defendant was not charged with, or convicted of, a drug offense. *Id.* § 2K2.1 cmt. 14(C).

Before applying the cross reference, the district court must consider the relationship between the offense of conviction—here, Bravo's firearm conviction—and the drug offense, "consistent with relevant conduct principles" in the Guidelines. *Id.* § 2K2.1 cmt. 14(E). *See also id.* § 1B1.3(a)(iii) (specifically noting the section's application to "cross references in Chapter Two"). If the defendant's "relevant conduct" includes "jointly undertaken criminal activity," the district court may hold the defendant accountable for another person's conduct only if that conduct was (1) "within the scope of the jointly undertaken criminal activity," (2) "in furtherance of that criminal activity," and (3) "reasonably foreseeable in connection with that criminal activity." *Id.* § 1B1.3(a)(1)(B). *See also id.* § 1B1.3 cmt. 3(A). All three requirements must be met. *Id.* And the district court must make this finding by a preponderance of the evidence. *United States v. Landreneau*, 967 F.3d 443, 451 (5th Cir. 2020).

B

To determine whether Sandoval's possession of 2,978 grams of methamphetamine was relevant conduct for which Bravo could be held accountable, the district court had to first determine the scope of the criminal activity that Bravo agreed to jointly undertake with Sandoval. U.S.S.G. § 1B1.3 cmt. 3(B).

Because the district court adopted the PSR, we start there. In the PSR, the probation officer concluded that Bravo and Sandoval were co-conspirators with respect to the stash of methamphetamine because (1) Sandoval is Bravo's cousin, (2) Bravo had previously purchased, and then redistributed, drugs from Sandoval, and (3) Bravo was arrested at Sandoval's home on the day of the raid where firearms, cash, and a stash of drugs were

discovered. In its response to Bravo's objections at sentencing, the Government also added that Bravo had been convicted of two drug-related crimes.

Precedent informs our analysis about determining the scope of a jointly undertaken criminal activity involving drugs. For example, in *United States v. Mitchell*, we reviewed a sentence that held the defendant responsible for 20 kilograms of drugs when he had pleaded guilty to conspiring to distribute only 0.5 kilograms. 964 F.2d 454, 461 (5th Cir. 1992). We noted that 20 kilograms is "quite a leap" from 0.5 kilograms and that nothing in the record suggested that the defendant was dealing in the range of 20 kilograms. *Id.* at 460. We vacated the sentence because "there was no indication of the regularity of [the defendant's] purchases, the amounts he purchased, or the length of time he had been associated with his suppliers." *Id.* at 461. In contrast, in *United States v. Ponce*, we affirmed a sentence that held the defendant accountable for his co-conspirators' drugs because the PSR contained substantial detail about how the conspiracy operated and what role the defendant played. 917 F.2d 841, 848–49 (5th Cir. 2020).

Here, none of the circumstantial facts in the PSR shows by a preponderance of the evidence that there was an agreement between Sandoval and Bravo with respect to the 2,978 grams of methamphetamine found inside Sandoval's home. While Sandoval and Bravo's familial relationship and Bravo's presence at Sandoval's home on the day of the raid support an inference that Bravo knew Sandoval was a methamphetamine distributor, these facts do not show that Sandoval and Bravo had an agreement with respect to the drug stash. Sandoval's previous sale of 56.7 grams of methamphetamine does not support that their agreement extended in scope to include the drug stash inside Sandoval's home. Finally, Bravo's two prior convictions also fail to show that the stash of methamphetamine was within the scope of an agreement between Bravo and Sandoval: The first

conviction was for a small amount of methamphetamine and did not involve Sandoval, and the second was for a small amount of marijuana.

The only fact in the PSR that directly supports the existence of a drug conspiracy between Bravo and Sandoval is that Sandoval told law enforcement that Bravo had previously purchased, and then redistributed, 56.7 grams of methamphetamine from Sandoval. Like *Mitchell*, the stash of 2,978 grams inside Sandoval's home is "quite a leap" from the 56.7 grams that Bravo had purchased. *See Mitchell*, 964 F.2d at 460. Moreover, nothing in the record suggests that Bravo and Sandoval were in a joint enterprise to distribute 2,978 grams of methamphetamine. *See id.* at 461. There is no evidence about the regularity of Bravo's purchases from Sandoval, whether those purchases took place at Sandoval's house, or how long Bravo had been associated with Sandoval's methamphetamine distribution. *See id.* And, unlike in *Ponce*, the PSR does not contain any information about the details of the drug conspiracy between Bravo and Sandoval or what role Bravo played in Sandoval's methamphetamine distribution. Finally, under our case law, the remaining facts asserted in the PSR do not support the inference of a conspiracy between Sandoval and Bravo involving the drug stash. In sum, nothing in the record establishes that Bravo agreed to conspire with Sandoval with regard to any amount of methamphetamine that Sandoval possessed beyond the 56.7 grams that Sandoval sold to Bravo. *See United States v. Roddy*, 812 F. App'x 285, 286 (5th Cir. 2020). *See also* U.S.S.G. § 1B1.3 cmt. 4(C)(vii) (providing an illustration of the scope of a jointly undertaken criminal activity to distribute drugs). Thus, the record does not support the PSR's statement that Bravo and Sandoval were co-conspirators with respect to the 2,978 grams of methamphetamine found inside Sandoval's home.

Because the record does not show by a preponderance of the evidence that the 2,978 grams of methamphetamine was within the scope of an agreement between Bravo and Sandoval, the district court clearly erred by

adopting the PSR's finding without making any explicit findings of its own. And we cannot disregard that error since the Government has not met its burden to show that the district court's clear error was harmless. *See United States v. Moton*, 951 F.3d 639, 644 (5th Cir. 2020).

## IV

On the evidence in this record, we are left with the "definite and firm conviction" that it was a mistake to hold Bravo accountable for the 2,978 grams of methamphetamine found inside Sandoval's home. *Torres-Magana*, 938 F.3d at 216. We therefore VACATE and REMAND to the district court for resentencing.